IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| BARBARA JEAN FLORES, | ) | Civil No.: 3:11-cv-01143-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

   Alan Stuart Graf
   316 Second Rd
   Summertown, TN 38483

     Attorney for Plaintiff


   S. Amanda Marshall, U.S. Attorney
   Adrian L. Brown, Asst. U.S. Attorney
   1000 S.W. 3rd Avenue, Suite 600
   Portland, OR 97204-2902


FINDINGS AND RECOMMENDATION - 1

Lisa Goldoftas
Willy M. Le
Social Security Administration
Office of the General Counsel
701 Fifth Avenue, Suite 2900, M/S 221A
Seattle, WA 98104

      Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Barbara Flores brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial
review of a final decision of the Commissioner of Social Security (the Commissioner) denying
her application for Disability Income Benefits (DIB) under the Social Security Act (the Act).
Plaintiff seeks an Order remanding the action to the Social Security Administration (the Agency)
for an award of benefits.  The Commissioner concedes that the ALJ erred in his analysis of
Plaintiff's application, and asks that the action be remanded for further proceedings.

For the reasons set out below, the Commissioner's decision should be reversed and this
action should be remanded to the Agency for an award of benefits.

### **Procedural Background**

Plaintiff filed an application for DIB on May 29, 2007, alleging that she had been
disabled since July 7, 2006, because of rheumatoid arthritis, hypertension, depression,
headaches, and degenerative disc disease.

After her claim had been denied initially and on reconsideration, Plaintiff timely
requested an administrative hearing.

On December 3, 2009, a hearing was held before Administrative Law Judge (ALJ)
Richard Say.   Plaintiff and Erin Martz, a Vocational Expert (VE), testified at the hearing.

In a decision filed on January 2, 2010, ALJ Say found that Plaintiff was not disabled
within the meaning of the Act.  That decision became the final decision of the Commissioner on

FINDINGS AND RECOMMENDATION - 2

August 16, 2011, when the Appeals Council denied Plaintiff's request for review.  In the present

action, Plaintiff challenges that decision.

## Background

Plaintiff was born on July 20, 1954, and was 55 years old at the time of the ALJ's

decision.  She did not obtain a high school education, and testified that she lacked only one

credit from graduating.  Plaintiff has past relevant work as a caseworker, a receptionist and an

administrative assistant.  She has not worked since June, 2006.

## Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is

disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary

of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir.

1999).

Step One.  The Commissioner determines whether the claimant is engaged in substantial

gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is

not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's

case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe

impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant

has a severe impairment, the Commissioner proceeds to evaluate the claimant's case under Step

Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the

Commissioner next determines whether the claimant's impairment "meets or equals" one of the

presumptively disabling impairments listed in the Social Security Administration (SSA)

regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal an impairment listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four. 20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform relevant work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  Id.

**Medical Record**

FINDINGS AND RECOMMENDATION - 4

Plaintiff established care with Dr. Mark Bajorek on April 8, 2005.  Dr. Bajorek diagnosed arthritis with probable osteoarthritis in Plaintiff's hands, and prescribed Volaren and Tramadol.  Plaintiff complained of chronic back pain on July 25, 2005.  Dr. Barjorek noted that Plaintiff's sacroiliac areas were tender bilaterally, and that prescribed medication did not appear to improve her condition.

Dr. Hans Carlson, an orthopedist at Oregon Health Sciences University (OHSU) diagnosed chronic low back pain after examining Plaintiff on July 26, 2005.  During a visit on August 2, 2005, Dr. Carlson reviewed Plaintiff's x-rays and recommended facet blocks and physical therapy.  Based upon  Plaintiff's level of discomfort, he opined that "aggressive conservative management" was warranted, and that surgical alternatives were also reasonable.

On September 20, 2005, Plaintiff was referred to the OHSU pain management clinic. There, Dr. Myrdalis Diaz-Ramirez noted that Plaintiff had a history of chronic mid low back pain, and that Plaintiff reported that Tramadol did little to ease the pain, and that Oxycodone was helpful.  Dr. Diaz-Ramirez noted tenderness over the right sacroiliac join and pain with leg rotation, and diagnosed "chronic low back pain secondary to myofascial," probable sacroilitis, and mechanical low back pain of facetogenic etiology.

Plaintiff consulted Dr. Robert Hart, an orthopedic surgeon, on May 9, 2006.  Plaintiff reported that she had experienced back pain for many years, and that the pain had worsened during the previous five years.  Based upon his review of her MRI, Dr. Hart concluded that the L4-5 area was "very degenerative," and that Plaintiff had also had less severe degenerative disc disease at L5-S1.  He opined that Plaintiff might be a candidate for fusion surgery, and arranged for further imaging of the affected area.

FINDINGS AND RECOMMENDATION - 5

Plaintiff was seen by Dr. David Sibell at the OHSU Comprehensive Pain Center on July 12, 2006.  Plaintiff told Dr. Sibell that she had experienced pain in her lumbar area during the previous 10 years.  She said that the pain had worsened since 2001, and had become intolerable.  Plaintiff reported that she could walk six miles per day, that physical therapy had not been effective, and that medications, including oxycodone, reduced her pain approximately 50%.

On July 18, 2006, Plaintiff told Dr. Hart that she continued to have significant lumbar pain.  Dr. Hart told Plaintiff that fusion surgery might decrease her pain, but that there was a risk that adjacent level disc disease might occur post surgery.  Plaintiff decided to have the surgery.  In an insurance form dated August 1, 2006, Dr. Hart opined that Plaintiff would be able to return to work full time six months following an operation.  On August 7, 2006, he performed a posterior interbody fusion of L4 through S1.

In his notes of a visit on November 7, 2006, Dr. Hart indicated that Plaintiff had "severe pain complaints, mainly in the left lower back and sacral area."  He adjusted her pain medication.

In chart notes of a visit on November 19, 2006, Dr. Hart indicated that Plaintiff continued to complain of "back and tail bone pain."  He noted that the x-rays looked "good," and showed no changes in alignment.  Dr. Hart stated that he thought Plaintiff was "actually . . . doing pretty well."  He was pleased that Plaintiff had reported that she had stopped taking oxycodone, and opined that this change in medication was  probably increasing her pain.

In an insurance form dated January 10, 2007, Dr. Hart assessed Plaintiff's functional limitations.  He noted that Plaintiff continued to experience pain in her low back and sacral area, and opined that Plaintiff could only occasionally sit, stand, and balance.  Dr. Hart indicated that Plaintiff could never lift or carry more than 10 pounds, and could never bend, crawl, climb stairs

FINDINGS AND RECOMMENDATION - 6

or ladders, kneel, or reach at the shoulder level.  He reported that Plaintiff's use of oxycontin and fentanyl patches was a barrier to her employment, and predicted that Plaintiff would be able to return to work in April, 2007.

In another insurance form dated April 24, 2007, Dr. Hart reported that Plaintiff continued to experience pain in the lower back and sacral area, and continued to take prescription pain medications.  He indicated that the date on  which Plaintiff would be able to return to work was "unknown."  Dr. Hart indicated that Plaintiff could sit and stand occasionally, defined as 1% to 33% of the day, and could walk frequently, defined as 34 to 66% of the day.  He repeated the postural limitations set out in his earlier assessment, except that he now opined that Plaintiff could continuously reach at and above the shoulder level.  Dr. Hart again found that Plaintiff could never lift, carry, or push or pull more than 10 pounds.

On July 10, 2007, Plaintiff sought treatment at the Chemawa Health Clinic.  Her primary complaints were listed as GERD, hypertension, and depression.  Plaintiff reported that medications were controlling her pain well.  Notes of the visit indicate that Plaintiff's "story changed when in the room," and that Plaintiff then asserted that her primary concern was long term disability.  The notes indicate that Plaintiff asserted that her application for disability benefits had been denied because her surgeon had opined that she could occasionally lift up to 10 pounds, and that Plaintiff requested a note stating that she was "incapable of lifting 1-10 pounds on occasion."  Plaintiff was diagnosed  with degenerative disc disease, depressive psychosis-severe, GERD, hypertension, and hyperlipidemia.

The Agency referred Plaintiff to Dr. Joseph Resendiz for an independent physical examination.  Dr. Resendiz examined Plaintiff on August 16, 2007.  In his evaluation, Dr. Resendiz reported that he spent 25 minutes with Plaintiff, and had reviewed none of her medical

records.  Dr. Resendiz reported that Plaintiff had complained that the chairs in the examination

room were dirty, and had stood throughout the examination.  He observed that Plaintiff walked

to the examination room without difficulty and took off her shoes without difficulty.  Dr.

Resendiz reported both that there was no evidence of poor effort or inconsistencies, and that

Plaintiff "made poor effort and could not or perhaps would not heel or toe walk."  Based

primarily on Plaintiff's statements, Dr. Resendiz diagnosed degenerative disc disease.  He

reiterated that he had no records that would confirm this diagnosis.

Dr. Resendiz reported that Plaintiff's examination was "remarkable only for a positive

straight leg raising test and the visible surgical scars which are well-healed in the paravertebral

lumbar areas functionally."  In his functional capacity assessment, he limited Plaintiff to

standing and walking 6 hours during an 8 hour workday, and opined that Plaintiff  would require

"some frequent breaks to avoid worsening of her paravetrebal lumbar and sciatica pain."   He

opined that Plaintiff could sit without limitation, could lift and carry 10 pounds frequently and 20

pounds occasionally, had moderate postural limitations on bending, stooping, and crouching, and

should limit repetitive bending and squatting in order to avoid exacerbation of her sciatica pain.

The Agency referred Plaintiff to Dr. Christopher Tongue, a psychologist, for a

psychological evaluation.  During her examination on August 30, 2007,  Plaintiff described a

difficult childhood and her employment history, which included work as a receptionist for

Governor Roberts, work as an administrative assistant for Governors Roberts and Kitzhaber, and

work as a receptionist and case manager for Adult and Family Services.  Plaintiff told Dr.

Tongue that chronic back pain was her greatest problem.  She described her mood as fairly good,

and said she had some irritability problems related to her pain.  She said she was able to make

her own breakfast, but that her husband did most of the cooking and that family members did

most of the household cleaning.  Plaintiff described her pain as constant, sharp, dull, deep, and

locking, and reported that in addition to back pain she had pain in her hips, buttocks, lower legs,

feet, hands, and fingers.  She rated her back pain at 10 and pain in her feet and legs as a 3 or 4 on

a 10 point scale.

Dr. Tongue administered psychological testing.   Dr. Tongue thought Plaintiff's score in

the 34th percentile on a test of immediate memory was related to her pain.  He noted that Plaintiff

appeared to have great difficulty staying in one position for long, and moved her leg up and

down in what she described as a method to distract herself from her back pain.

Dr. Tongue did not diagnose any mental disorders, and summarized Plaintiff's condition

as follows.

> I would not describe her as currently suffering from mood disorder secondary to her
> medical condition, and she shows no evidence of any cognitive impairment;
> however, if her behavior on interview is any indication, pain would be a significant
> factor in any attempts she might make to maintain the concentration, persistence, and
> pace necessary for participation in employment over the course of an ordinary work
> day.

Dr. Tongue rated Plaintiff's Global Assessment of Functioning (GAF) as 55.

Plaintiff returned to the Chemawa Health Clinic on March 5, 2008 for evaluation of her

medications and allergies.  Notes of the visit state that Plaintiff had chronic back pain which was

well controlled with medications.

During a visit to the Chemawa Health Clinic on June 9, 2008, Plaintiff reported that her

pain was controlled with 3 percocet and 2 to 3 tramadol daily.  Plaintiff reported that she was

experiencing problems with depression, and indicated that her symptoms included fatigue,

anhedonia, lethargy, and lack of motivation.  On December 29, 2008, she reported that she felt

relief from pain only when she was in the water, and that she exercised on a treadmill 10 minutes

at a time several  times a day.  Notes indicate that Plaintiff changed positions frequently, paced,

FINDINGS AND RECOMMENDATION - 9

and alternated between sitting and standing.

On April 27, 2009, Plaintiff returned to OHSU to consult with Dr. Bajorek, her former treating physician, concerning her continuing back pain. Plaintiff reported that she continued to experience significant pain even while taking morphine. On examination, Plaintiff was limited to 30 degrees twisting to either side, and reported that her entire lumbar-sacral spine was exquisitely tender on palpitation. Dr. Bajorek encouraged Plaintiff to work with her current treating physician or a pain specialist.

In a visit to the Chemawa Health Clinic on June 1, 2009, Plaintiff complained of neck pain, and reported that she had experienced numbness and tingling in her right arm during the previous three days despite an increase in her tramadol dosage.

During an office visit on July 8, 2009, Plaintiff told Dr. Bajorek that she had numbness in her right hand and numbness extending into her right leg and buttock. Plaintiff reported that neurontin was not effectively relieving her back pain. Dr. Bajorek recommended that Plaintiff consult with her regular doctor about imaging to help determine whether she should be treated with physical therapy or surgery. He noted that Plaintiff had been diagnosed with carpal tunnel in the right wrist, but that a surgery intended for that wrist had been mistakenly performed on the left wrist instead.

On September 1, 2009, Plaintiff returned to the Chemawa Health Clinic with complaints of pain radiating down her right leg.

In a letter addressed to Plaintiff dated October 14, 2009, Dr. Bajorek stated:

Feel free to use this letter for your employer or case worker.
You have been seen for chronic back pain and headaches. The degree of pain has prevented you from being able to return to work since your surgery.

I think you might benefit from therapy and be able to return to gainful employment.

FINDINGS AND RECOMMENDATION - 10

In his notes of an office visit on the same date, Dr. Bajorek stated that Plaintiff experienced chronic back pain resulting from a failed back surgery.  He noted tenderness from Plaintiff's mid-thoracic spine to her lumbar region, including the site of the surgical incisions. Plaintiff's medications included tramadol, neurontin, and morphine for pain relief and anti-depression medication.  Dr. Bajorek "encouraged a repeat look at acupuncture" as part of Plaintiff's pain management plan.

Dr. Bajorek completed a Medical Source Statement dated November 13, 2009,  setting out his assessment of Plaintiff's functional capacity.  Dr. Bajorek opined that, during an 8-hour work day, Plaintiff: 1) needed more than the regularly scheduled breaks; 2) could sit for 15 minutes at time, for a total of no more than 2 hours; 3) could walk and/or stand no more than 15 minutes at a time for a total of no more than 2 hours; 4) would need to take unscheduled work breaks every 15 minutes; 5) could occasionally lift up to 5 pounds; 6) would need to rest lying down or reclining for a total of 6 hours; and 7) could occasionally reach and handle with her hands.  He opined that Plaintiff's ability to complete a normal workday and/or work week without interruptions from psychologically based symptoms, and ability to ask simple questions or request assistance were "fair," and indicated that Plaintiff was "unable to maintain a position for more than 15 min[utes]."  Dr. Bajorek opined that these limitations had not existed since July 7, 2006, but were permanent.  He left blank a space provided for an opinion as to the onset of disability date.

Plaintiff complained of severe pain during a visit to the Chemawa Health Clinic on November 20, 2009.   Dr. Aaron Hanson noted that Plaintiff said her

> pain is so great she can't go out of her house.  last time she was out of her house was last time she came for pain meds.  husband with patient worries her pain is bad.  feels depressed all the time because feels she has pain.  pain over tailbone and lower back.

states has pain going down back and leg.  last time she had seen a specialist was 2006 when she had her surgery feels she's never been pain free since. states in last 3 mo been having pains shooting down back and right hip.  is interested in getting on disability.

During a visit to the Chemawa Health Clinic on March 22, 2010, Plaintiff complained of continuing back pain.  She reported that her application for disability benefits had been denied a second time in part because an examining physician had asserted that she was rude because she complained about being told to sit in a chair on which a patient had recently urinated.  Plaintiff continued to "express [a] plan to get disability."  She also reported that she had not followed up with the OHSU "ortho or spine clinic" because they had rescheduled her appointments too many times and she had lost her insurance coverage.

On September 9, 2010,  Plaintiff returned to the Chemawa Health Clinic with complaints of back pain, depression, and night sweats.  Plaintiff reported that she had applied for disability and was "waiting to hear."  Her diagnoses included degenerative disc disease, depression, GERD, hypertension, and menopause.

A medication chart dated August 11, 2011 indicated that Plaitniff continued to take morphine sulfate and tramadol for pain.

**Testimony**

**Plaintiff**

Plaintiff testified as follows at the hearing.

Plaintiff is 5 ft. 2 inches tall and weighs 180 pounds.  She lives with her disabled husband, who does most of the household chores.  Residuals from back surgery are the primary impediments to Plaintiff's ability to work.  Plaintiff is depressed, and takes prescribed medications for depression as well as back pain.  She started taking anti-depressants about six or eight months before the hearing.

FINDINGS AND RECOMMENDATION - 12

Plaintiff takes all of the medications prescribed for her.  She cannot always bathe and dress herself; she sometimes needs help from her husband, who also helps her shave her legs, for these activities.  Plaintiff's husband and daughter do most of the cooking; the only housework Plaintiff does is fold laundry, which she does for ten minutes at a time while sitting on the bed.  Plaintiff has not driven since her doctors tripled her dosage of morphine.  She experiences severe episodes of back, hip, and leg pain.  Plaintiff shops, reluctantly, with her husband a few times a month.

Plaintiff spends most her days resting.  She tries to shower, but is not always able to do so.  She is able to sit for 5 to 15 minutes, and then needs to either lie down or walk.  She can stand for 10 to 15 minutes, can lift up to five pounds, and wears slip on shoes because she cannot tie her shoes.

Plaintiff has some good days and some bad days.  On particularly good days, Plaintiff's grandchildren visit, and Plaintiff is able to read to them or watch a movie with them.  On bad days, Plaintiff stays in bed, except to use the bathroom.  Extreme pain sometimes confines Plaintiff to her upstairs bedroom for a week at a time.

Plaintiff described her symptoms and impairments as follows in a Functional Report dated July 15, 2007.

Plaintiff spends her days sitting in a recliner, lying in bed, watching television, and eating meals.  On some days she showers.  Before her illness, Plaintiff could walk, hike, ride bicycles, swim, drive, and run.  She can no longer do these activities.  Plaintiff's husband helps her dress, bathe, care for her hair, and shave.  Sometimes he helps her use the toilet.  Plaintiff needs to be reminded to take her medications.

Plaintiff can feed herself, and is able to prepare her own meals a few times a week.  At times she can sit and iron for an hour or so.  Plaintiff does not go shopping, pay bills, or handle the family checking account.  She likes to sew and paint, but can rarely do these activities following her illness.  Pain keeps her from lifting, squatting, bending, standing for long periods, reaching, walking, sitting, kneeling, climbing stairs, using her hands, or completing tasks.  She continues to regularly use a walker that her surgeon prescribed for her in 2006.

**Lay Witness Testimony**

Sherri Mortonson submitted a "to whom it may concern" statement dated December 2, 2009.  Mortonson stated that she had been Plaintiff's neighbor for more than seven years.  She reported that Plaintiff had been an active, hardworking person before her surgery, and had since become home bound and inactive.  Mortonson stated that she helped Plaintiff once or twice a week, and that it was obvious that Plaintiff's quality of life had become "dismal" since her surgery.  She said she had been present when Plaintiff had experienced painful episodes that had required complete bed rest.

**ALJ's Decision**

At the first step of his disability analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of her disability.

At the second step, the ALJ found that Plaintiff's lumbar degenerative disc disease post fusion L4-5 and L5-S1 and obesity were severe impairments.

At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment set out in the listings, 20 C.F.R. Part 404, Subpart P., App.1.

The ALJ next assessed Plaintiff's residual functional capacity (RFC).  He found that Plaintiff retained the capacity to perform light exertional level work, subject to the following limitations: She could only occasionally stoop, crouch, crawl, kneel, and climb stairs and ladders; and needed to avoid concentrated exposure to dust, fumes, gases, and vibration.  The ALJ found that Plaintiff's  statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with this assessment.

Based upon the testimony of the VE, at the fourth step, the ALJ found that Plaintiff could perform her past relevant work as an administrative assistant, case worker, and receptionist.  In reaching this conclusion, the ALJ concluded that Plaintiff's description of her symptoms and limitations was not wholly credible.  Because he found that Plaintiff could perform this work, he found that she was not disabled within the meaning of the Act, and did not proceed to step five.

### Standard of Review

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Claimants bear the initial burden of establishing disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  The Commissioner bears the burden of developing the record,  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991), and bears the burden of establishing that a claimant can perform "other work" at Step Five of the disability analysis process.  Tackett, 180 F.3d at 1098.

FINDINGS AND RECOMMENDATION - 15

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

## Discussion

Plaintiff contends that the ALJ erred in concluding that she was not wholly credible, erred in his assessment of the opinions of treating and examining doctors, and failed to provide sufficient reasons for rejecting lay witness testimony.   Because it is the most clearly dispositive issue, I will address the ALJ's evaluation of medical opinion first.

1. **Rejection of Medical Opinion**

Plaintiff contends that the ALJ failed to provide legally sufficient support for his rejection of the opinions of two treating doctors, erred in crediting instead the opinion of the examining doctor, and erred in failing to address the opinion of the examining psychologist.

**Evaluating Medical Opinion**

Because treating physicians have a greater opportunity to know and observe their patients, their opinions are given greater weight than the opinions of other physicians. Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989).  An ALJ must provide clear and convincing reasons for rejecting a treating physician's uncontroverted opinions,  Lester v. Chater,

81 F.2d 821, 830-31 (9th Cir. 1995), and must provide "specific, legitimate reasons . . . based upon substantial evidence in the record" for rejecting opinions of a treating physician which are contradicted.  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (citations omitted).

The opinion of an examining physician is entitled to greater weight than the opinion of a non-examining physician.  Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990).  An ALJ must provide clear and convincing reasons for rejecting the uncontradicted opinions of an examining physician, id., and must provide specific and legitimate reasons for rejecting opinions of an examining physician that are contradicted by another physician.  Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995).

**Analysis**

1. **Dr. Bajorek**

Plaintiff established care with Dr. Bajorek in April, 2005, and saw him periodically through October, 2009.  As noted above, Dr. Bajorek opined that Plaintiff's pain had prevented her from returning to work since her surgery, and completed an assessment of Plaintiff's functional capacity indicating that Plaintiff was so severely impaired that she would require 6 hours of rest during an 8 hour workday.

Because Dr. Bajorek's opinions were inconsistent with those of Dr. Resendiz, an examining physician, the ALJ was required to support their rejection with reasons that were specific, legitimate, and supported by substantial evidence in the record.

The ALJ rejected Dr. Bajorek's opinions on the grounds that they were not supported by his medical findings; were inconsistent with x-rays showing normal postoperative alignment, intact fusion, and no instability; and were inconsistent with evidence that Plaintiff was able to paint and to walk on a treadmill several times a day.  He asserted that Dr. Bajorek's only medical

finding was a report of tenderness in Plaintiff's mid thoracic and lumbar spine and at the sites of her surgical incisions.

These reasons do not accurately reflect the medical record, and are insufficient.  The medical records indicate  that Dr. Bajorek based his conclusions as to Plaintiff's functional capacity on a substantial treating history, physical examinations, medical reports, and numerous x-rays, and Dr. Bajorek explicitly affirmed that his assessment was based on "acceptable clinical and laboratory diagnostic techniques" on the form setting out his evaluation of Plaintiff's limitations.  In asserting that Dr. Bajorek erred in diagnosing a failed back surgery despite x-rays showing normal postoperative alignment, intact fusion, and no instability, the ALJ implicitly found that imaging evidence ruled out a "failed back surgery" diagnosis.  This exceeded his role and expertise: Though ALJ's are  responsible for resolving conflicts in the medical record, they not qualified to substitute their judgment for that of a medical expert.  See, e.g., Ratto v. Secretary of Health and Human Services, 839 F.Supp. 1415, 1427 (D. Or. 1993); Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (ALJ not qualified medical expert).   The record did indicate that at times Plaintiff walked on a treadmill briefly several times daily as part of her post-surgery rehabilitation, and occasionally painted.  However, the record shows that Plaintiff decreased and largely abandoned these activities as her complaints of severe, unremitting pain continued.  In any event, the ALJ did not explain how the ability to walk a few minutes a day or to occasionally paint was inconsistent with Dr. Bajorek's functional assessment, and such inconsistency is not apparent.

## 2. **Dr. Hart**

Dr. Hart, Plaintiff's orthopedic surgeon, saw Plaintiff a number of times after her surgery. On September 19, 2006, Dr. Hart opined that Plaintiff could return to work in six months.  On

November 7, 2006, Dr. Hart noted that Plaintiff complained of severe pain "mainly in the left lower back and sacral area," and adjusted Plaintiff's pain medication.

On January 10, 2007, Dr. Hart limited Plaintiff to occasional sitting, walking, and standing, limited her lifting to 10 pounds, and opined that Plaintiff would be able to return to work on April 10, 2007.  On April 24, 2007, he indicated that Plaintiff was still experiencing pain and taking pain medications, diagnosed Plaintiff with lumbar spondylosis and degenerative disc disease, opined that Plaintiff could occasionally sit and stand and could frequently walk, and indicated that the date on which she could return to work was "unknown."  At that time, he indicated that he had last seen Plaintiff on November 7, 2006, listed Plaintiff's pain medications in detail, and stated that he could corroborate Plaintiff's complaints.

The ALJ rejected Dr. Hart's opinions concerning Plaintiff's functional limitations because Dr. Hart had changed his opinion of her probable recovery over time without evidence of supporting examination findings.  Plaintiff contends that this is not a sufficient basis for rejecting Dr. Hart's opinion.  I agree.  Though the records do not indicate how Dr. Hart was informed of Plaintiff's ongoing severe difficulties after he saw her on November 7, 2006, it is clear that he continued to receive information concerning her condition after that time, and that in his professional judgment, he considered his updated information sufficient to permit him to report on her "current symptoms" and to sign insurance forms acknowledging that he was subject to civil and/or criminal penalties if he made fraudulent statements.  Dr. Hart clearly knew what pain medications Plaintiff was taking in the months after her surgery, and obviously believed that he had the information needed to reassess her progress and reevaluate her prospects for returning to work as her condition failed to improve during the months following surgery.  That Dr. Hart changed his predictions concerning  the likely course of Plaintiff's recovery in

light of her lack of progress is not a sufficient basis for discounting his opinions.  Before he

performed the fusion, Dr. Hart had expressly warned of the risk of continued problems related to

disc disease following surgery.  As an experienced orthopedic surgeon and Plaintiff's treating

physician, Dr. Hart could be expected to alter his predictions as to Plaintiff's ability to return to

work if her recovery did not proceed as he had initially hoped or expected.

      If the ALJ thought that the record concerning the basis of Dr. Hart's opinion was

inadequately explained or ambiguous, he could have submitted questions to Dr. Hart or kept the

record open following the hearing to supplement the record on this issue.  E.g., Tonapetyan v.

Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).   The ALJ did not do so, and did not provide an

adequate basis for discounting Dr. Hart's opinions included in the existing record.

### Dr. Tongue

      Dr. Tongue, an examining psychologist, found no evidence of a mood disorder or any

cognitive impairment.  However, he opined that, if Plaintiff's behavior during her interview was

"any indication, pain would be a significant factor in any attempts she might make to maintain

the concentration, persistence, and pace necessary for participation in employment over the

course of an ordinary work day."

      Plaintiff correctly notes that the ALJ did not address Dr. Tongue's evaluation, and

contends that this omission was harmful in light of Dr. Tongue's conclusion that "pain would be

a significant factor" in her ability to work.

      Though I agree that the ALJ should have addressed Dr. Tongue's opinion, I am not

convinced that his failure to do so was more than harmless error.  Dr. Tongue did not

unambiguously opine that Plaintiff in fact experienced pain to the degree that she demonstrated.

Instead, he stated that Plaintiff's pain would interfere with her ability to work "if" Plaintiff

FINDINGS AND RECOMMENDATION - 20

experienced the pain reflected in the conduct he observed. This may have implied that Dr.

Tongue was not confident that Plaintiff experienced the degree of pain that she demonstrated.

Under these circumstances, I would not recommend that this action be remanded for an award of

benefits if failure to address Dr. Tongue's evaluation was the only error in the ALJ's evaluation

of medical opinion.

**Dr. Resendiz**

As noted above, Dr. Resendiz an examining physician, reported that he spent 25

minutes with Plaintiff, reviewed none of her medical records, and found both that there was no

evidence of poor effort or inconsistencies, and that Plaintiff "made poor effort . . . ." Dr.

Resendiz opined that Plaintiff could stand and walk 6 hours during an 8 hour workday, and

would require "some frequent breaks to avoid worsening of her paravetrebal lumbar and sciatica

pain." He opined that Plaintiff could sit without limitation, could lift and carry 10 pounds

frequently and 20 pounds occasionally, had moderate postural limitations on bending, stooping,

and crouching, and should limit repetitive bending and squatting in order to avoid exacerbation

of her sciatica pain.

In contrast to his assessment of the opinions of Plaintiff's treating physicians, the ALJ

gave Dr. Resendiz's opinion "great weight." Plaintiff contends that the ALJ erred in doing so,

and further erred in failing to include the need for "some frequent breaks" in his assessment of

her RFC. She also argues, that, if Dr. Resendiz's opinion that she needed "frequent breaks" were

credited, a finding of disability would be required because relevant regulations define "frequent"

as 1/3 to 2/3 of the day--an amount of time that would preclude employment--and because the

VE testified that federal guidelines require employers to provide only 2 scheduled breaks per

day.

The Commissioner concedes that the ALJ erred in failing to include a requirement for "some frequent breaks" in his assessment of Plaintiff's RFC, and acknowledges that Dr. Resendiz's report included significant inconsistencies.  He argues that this action should be remanded to the Agency for clarification of "quantity of breaks" that Plaintiff needs, and to "determine if Plaintiff could still maintain employment in spite of them."

I disagree with the Commissioner's contention that further proceedings are needed. Regardless of what Dr. Resendiz meant by "some frequent breaks," the ALJ erred in crediting his internally inconsistent report, which reflected the review of none of Plaintiff's relevant medical records, while rejecting the more fully supported opinions of Plaintiff's treating doctors discussed above.  When an ALJ fails to provide adequate reasons for rejecting the opinion of a treating physician, the opinion is credited as a matter law.  Lester, 81 F.3d at 834.  Remand for an award of benefits is then appropriate if the record is fully developed, and it is clear that a finding of disability would be required if the improperly rejected evidence were accepted. Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996).  Here, remand for an award of benefits is appropriate because the record is fully developed, and a finding is disability is clearly required if the improperly rejected opinions of Plaintiff's treating physicians are credited.

2. **Plaintiff's Credibiltiy**

My conclusion that this action should be remanded for the reasons discussed above makes it unnecessary to address the remaining issues Plaintiff has raised.  I will nevertheless briefly address these issues in order to create a full record for review.

Where, as here, a claimant produces medical evidence of an underlying impairment that is reasonably expected to produce some degree of the symptoms alleged and there is no affirmative evidence of malingering, an ALJ must provide "clear and convincing reasons" for an adverse credibility determination. Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996); Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006).

The ALJ asserted that Plaintiff's complaints of depression and debilitating pain were inconsistent with medical records showing that her depression was well controlled with medication, with several notes in the record indicating that Plaintiff's pain was well controlled with medication,  with her surgeon's predictions that she would be able to return to work several months following surgery, and with the results of Dr. Resendiz's examination.

Plaintiff contends that these are not clear and convincing reasons for finding that her allegations of disabling pain and physical limitations were not wholly credible.  I agree.  As noted above, though he originally opined that Plaintiff would be able to return to work after specified periods, Plaintiff's surgeon altered his assessment in light of Plaintiff's ongoing pain, and in his last report indicated that the date on which she might return to work was unknown. Though medical notes occasionally indicated that substantial pain medications, including morphine, controlled Plaintiff's pain, the majority of the treatment records indicated that Plaintiff's pain was not adequately controlled.  As noted above, Dr. Resendiz's report was internally inconsistent and reflected no examination of the extensive medical record, and his opinion that Plaintiff needed "some frequent breaks" in any event may support a finding of disability.

The ALJ did not provide sufficient reasons for discrediting Plaintiff's credibility, and her testimony, if accepted, would require a finding of disability.  Under these circumstances, the

action should be remanded for an award of benefits.  <u>See</u>, <u>e.g.</u>, <u>Lester v. Chater</u>, 81 F.3d 821, 834

(9th Cir. 1995) (remand for award of benefits appropriate if claimant's testimony rejected without

sufficient support and testimony would establish disability if accepted).

3. **<u>Rejection of Lay Witness Testimony</u>**

 An ALJ must provide reasons that are "germane" for rejecting lay witness testimony.

<u>Molina v. Astrue</u>, 674 F.3d 1104, 1114 (9th Cir. 2012).

 As noted above, Sherri Mortonson, a lay witness, stated that Plaintiff had become largely

inactive and housebound following her surgery.  The ALJ rejected this testimony on the grounds

that there was "no evidence" that resting during the day was a "medical necessity" for Plaintiff.

 This observation may have been "germane," but it was not accurate, in light of Dr.

Barjorek's functional assessment indicating that Plaintiff would need to lie down for six hours

during an eight hour work day.  In any event, this issue is not significant in light of the other

errors discussed above.

<u>Conclusion</u>

 A judgment should be entered REVERSING the Commissioner's decision and

REMANDING this action to the agency for an award of benefits.

<u>Scheduling Order</u>

 This Findings and Recommendation will be referred to a district judge.  Objections,

if any, are due December 31, 2012.  If no objections are filed, then the Findings and

Recommendation will go under advisement on that date.

FINDINGS AND RECOMMENDATION - 24

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 10th day of December, 2012.


_____/s/ John Jelderks_____
John Jelderks
U.S. Magistrate Judge